MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:    (702) 776-3333
Facsimile:    (702) 505-9787
*E-Mail:*    *service@the702firm.com*

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
JONATHAN L. HILTON, ESQ.
Nevada Bar No. 16889
**HILTON PARKER LLC**
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
Telephone:    (614) 992-2277
Facsimile:    (614) 927-5980
*E-Mail:*    *gparker@hiltonparker.com*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| CHLOE C., pseudonymously, | Case No. : 2:23-cv-2056 |
| Plaintiff, | Judge Gloria M. Navarro |
| vs. | Mag. Judge Brenda Weksler |
| JAMAL F. RASHID a/k/a "MALLY MALL"; WYNN LAS VEGAS, LLC,; MGM GRAND HOTEL, LLC; STK LAS VEGAS, LLC; and TAO GROUP OPERATING, LLC, | **THIRD AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff CHLOE C., by and through her attorneys, MICHAEL C. KANE, ESQ., BRADLEY J. MYERS, ESQ., and JOEL S. HENGSTLER, ESQ. of THE702FIRM and GEOFFREY C. PARKER of HILTON PARKER LLC, states as follows:

**PARTIES**

1.    Plaintiff Chloe C. ("**Chloe**") is a natural person residing in Clark County, Nevada.

2.    Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Nevada Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym; and (2) setting limits on how her identity may be disclosed.

3. Defendant JAMAL F. RASHID ("**Rashid**") is a natural person who, on reference, resides in Clark County, Nevada. Defendant Rashid uses the assumed name "Mally Mall" in connection with both his artistic career and his criminal endeavors.

4. For the purposes of this Complaint, the "**Casino Defendants**" consist of:

   a. Defendant WYNN LAS VEGAS, LLC ("Wynn") is a Nevada limited liability company. Wynn operated the Wynn Las Vegas casino hotel ("the Wynn") at all relevant times.

   b. Defendant MGM GRAND HOTEL, LLC ("MGM Grand") is a Delaware corporation. It operated the MGM Grand Hotel & Casino ("the MGM Grand") at all relevant times.

5. For purposes of this Complaint, the "**Captive Business Defendants**" are:

   a. Defendant STK LAS VEGAS, LLC ("STK") is a Nevada limited liability company that operated the STK Steakhouse located inside the Cosmopolitan at all relevant times.

   b. Defendant TAO GROUP OPERATING, LLC ("Tao Group") is a Delaware limited liability company that operated the Marquee Nightclub located inside the Cosmopolitan and the OMNIA Nightclub located inside the Caesars at all relevant times.

### INTRODUCTION
### Sin City

6. From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

7. By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution. "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

8. Although prostitution had technically been illegal in Clark County since 1931, easy access to commercial sex remained key part of the city's allure for many male visitors.

9. This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector. As late as the mid-1950s, the Clark County Sheriff still tolerated a brothel operating openly just a few miles off the Strip. Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

2

10. Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image. For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

11. Worse, Vegas casinos have long invited a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

12. As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available, much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy." SCHWARTZ, DAVID, SUBURBAN XANADU 61 (2013).

13. This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player." *Id.*

14. At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises." *Id.*

15. Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

16. But even today, the hierarchy the casinos pioneered decades ago remains largely intact: A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a disadvantage versus more "tolerant" competitors. And recent research shows casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

3

17.    The casinos also continue to broadcast obvious hints about the sexual services available to their guests.  Perhaps the best example of this is the world-famous slogan: "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

18.    Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous.  Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations.  But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to tolerate sex tourism.

19.    Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it.  *See* Lopez, Sandy, *Prostitution in Nevada has its advantages, experts say*, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts-say/.

20.    So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making and did it anyway.

<u>What Happens in Vegas</u>

21.    Contrary to the comfortable myth spread by those who benefit from prostitution, there is no way to welcome "consensual prostitution" without welcoming sex trafficking.

22.    Today, Nevada retains its status as the "symbolic center of the commercial sex industry."  Heineman, Jennifer et al., *Sex Industry and Sex Workers in Nevada*, SOCIAL HEALTH OF NEVADA, 1 (2012), *available at* digitalscholarship.unlv.edu/social_health_nevada_reports/48.

23.    It is no coincidence that Nevada is also the State with the second-highest rate of human trafficking.  *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.

24.    The FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas."  *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

25. Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps. Farley, Melissa et al., *Online Prostitution and Trafficking*, ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-online-prostitution-and-trafficking (collecting studies).

26. Chloe, the Plaintiff in this case, spent seven years under the thumbs of a series of pimps in Las Vegas and, briefly, New York City. During that time, the pimps who controlled her threatened her, beat her, raped her, forced her to have sex with thousands of men, took all or nearly all her earnings, held onto her identification documents, controlled her access to basic needs like food and housing, and had her watched at all times.

27. One pimp imprisoned Chloe for months in the same hotel, where he forced her to have sex with as many as ten men each day. Another impregnated her against her will and then, after she tried and failed to escape, held a gun to her head and threatened to kill her in front of her son. She ultimately escaped only because she was willing to take that risk, and even then her escape required outside help and weeks of careful planning.

28. Sadly, Chloe's story is far from unique. In fact, nearly all pimp-controlled prostitutes—and thus the great majority of all prostitutes—are the victims of coercion.

29. For a start, it is standard practice for pimps to take all or nearly all of the money earned by the women and girls they control. The pimps then use the money to pay for their victims' needs only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp. *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

30. In addition to total financial dependence, pimps control their victims through a mixture of other means that varies from pimp to pimp. Physical violence is a common component. *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL

JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm.)

31.    Other common components include renting victims' housing in the pimp's name, retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to separate victims from their children if they disobey or try to leave.

32.    As a result, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences.  On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

33.    All Defendants know or should know these basic facts about the nature of the sex trade that they welcome into their properties.  At the very least, all must be aware that some significant proportion of the prostitutes whom they permit their guests to patronize—and permit their employees to assist guests in patronizing—are, in fact, human trafficking victims.

34.    Unfortunately, it appears that Defendants will continue welcoming prostitution into their properties until doing so ceases to be a net positive for their bottom lines.

**BACKGROUND**

Abandonment and Betrayal (1990–2010)

35.    Chloe grew up in a broken home in the Florida panhandle.

36.    Her parents divorced when she was 2, and what relationship she had with her father ended around age 13, after he beat her severely and a teacher noticed her injuries.

37.    Chloe's mother suffered from alcoholism and drug addiction.  When Chloe was 15 years old, her mother moved in with a new boyfriend and left Chloe behind, alone.  As a farewell gift, she pre-paid two months of rent before she left.

38.    After the rent ran out, Chloe lived on couches and with older boyfriends.  Because of her unstable living situation, she was in and out of school, and she never managed to graduate.  Still, she somehow made it to adulthood without ending up either on the streets or in prison.

39.    In about 2009, when Chloe was 18 or 19, she earned her GED.

40. At around the same time, she took a job as a server at Hooters. It seemed like the best job available for a young, blonde, conventionally attractive girl with few other options.

41. Chloe's co-workers at Hooters told her tales about the money to be made by working in strip clubs.

42. Eventually Chloe was persuaded, and she started working at a strip club in Tampa. The job paid well, and Chloe briefly found something almost like stability.

43. Unfortunately, it was there that Chloe met an older dancer named Ashley.[1]

44. After they had known each other for several months, Ashley told Chloe that she had connections to the rap artist Lil' Wayne, and she flashed a wad of cash to convince Chloe she'd make good money if they flew to Las Vegas and danced at a party he was about to throw.

45. Ashley provided Chloe with a plane ticket, telling her she'd paid for it herself.

46. After they landed, Ashley took Chloe to her friend's apartment where she said they'd be staying, and she had Chloe drop off her belongings. Then Ashley and her friend Jenny[2] took Chloe out for a night on the town.

47. When the group got back to Jenny's apartment after partying, Chloe was surprised to find a giant of a man waiting at the apartment table and giving off a palpable air of violence.

48. Only then did Ashley reveal she hadn't paid for Chloe's ticket—the giant had.

49. Ashley said that now Chloe would have to repay the man for her plane ticket, and that her friend Jenny was his girl and could show Chloe how.

50. Then Ashley walked out, and Chloe was alone in the apartment with Jenny and the frightening man, who turned out to be Jenny's pimp Walter.[3]

51. Jenny and Walter had control of Chloe's few worldly possessions, which she had left in the apartment before going out for the evening. They also said that Chloe owed Walter money, and she was terrified of the implied "or else."

---

[1] Ashley is a fictitious name. This person's real name is not known with certainty. The name that she used with Plaintiff is not used herein because she is not a party—and because she was a victim as well as a perpetrator.
[2] Jenny is a fictitious name, used for the same reasons given in fn. 1.
[3] Walter is a fictitious name. This person's real name is known. It is not used herein because Plaintiff fears retribution and because naming him as a party would be futile.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

7

52.     Chloe was 19 years old, tipsy, and trapped in a strange city in the middle of the night.  She had no resources and no friends to turn to, and she was at the mercy of a hulking stranger who might kill her with his bare hands before anyone heard a scream.

53.     So, Chloe played along to survive.  She agreed to repay Walter for the ticket.

<u>Total Control (2010–2011)</u>

54.     The next day, Jenny introduced Chloe to the sex trade by bringing her along on the "out calls" she performed for a Las Vegas escort service.  An "out call" is when a sex worker travels to the client, rather than the client coming to the sex worker.

55.     Jenny demanded that Chloe perform sex acts for money on the out calls, and over time she taught Chloe how to get the most money possible out of each client.

56.     Each morning, Walter helped himself to the money in Jenny and Chloe's purses. The implied consequences if he thought any was missing—and the knowledge that Jenny would tattle to Walter in a heartbeat—kept Chloe from trying to hide any of her earnings.

57.     The girls were not allowed to buy anything for themselves.  Instead, Walter would pay for their food, their shelter, and whatever else he thought they needed—such as clothing, manicures, makeup, and other tools of the trade—using the money they had earned.

58.     Walter also kept control over their identification documents.

59.     Over time, Chloe heard stories from Jenny and other girls about Walter's abusive and degrading treatment of other girls in the past, and she learned that he was notorious throughout Las Vegas as an old school "gorilla pimp," meaning a pimp who uses fear and physical violence to keep his girls obedient and profitable.

60.     The stories about Walter's violent past terrified Chloe even more.

61.     Although Chloe lived in fear of provoking Walter's anger, and she did her best to avoid it at all costs, that proved an impossible task.

62.     On one occasion, when Walter thought that Chloe had spoken to another pimp, he grabbed her by the neck and lifted her off the ground, one-handed, while he choked, berated, and threatened her.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

63. On another occasion, when Chloe's failure to stop crying on command annoyed him, Walter simply punched her in the face.

64. Eventually, Walter grew confident enough in his control over Chloe to sign her up with the escort service and let them send her on out calls alone. Still, he kept control of Chloe's possessions, and she remained too afraid to try to hide anything from him.

65. Over the roughly four-month period that Chloe worked for Walter and did out calls for the escort service, she travelled to meet clients in many of the hotels and casinos around Las Vegas.

66. The escort service didn't always have clients for everyone, however, and Walter still expected Chloe to be making him money when she wasn't doing out calls.

67. The next best way to pick up clients was to "walk the carpet," which means roughly the same thing as "walking the street," but inside Las Vegas's casinos.

68. Both when doing out calls and when walking the carpet, Chloe would enter casinos—including the Wynn, the Aria, the Cosmopolitan, the MGM Grand, and the Caesars— wearing clothing and makeup that intentionally advertised her availability for commercial sex.

69. On information and belief, during this time she entered all five of the casinos named above on multiple occasions for the purposes of commercial sex.

70. The Casino Defendants used sophisticated facial recognition software with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

71. One major purpose of this facial recognition software was to assist their security staff in turning away persons the Casino Defendants considered undesirable. It did this by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

72. On information and belief, the Casino Defendants' facial recognition software was able to (and did) recognize and flag Chloe as a suspiciously frequent visitor to each casino.

73. On information and belief, the Casino Defendants' security employees ignored the flag on Chloe because they understood the Casino Defendants' policy that only undesirable or disruptive sex workers should be singled out, and then only to be turned away or ejected.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

74. The Casino Defendants had the ability to cross-reference this facial recognition software with their guest room telephone records.

75. If they had performed such cross-referencing, it would have revealed the regularity with which Chloe (and numerous other probable trafficking victims) visited guest rooms in each casinos immediately after the same guest rooms placed calls to an escort service.

76. On information and belief, at least half of Chloe's out calls at each of the Casino Defendants' properties was preceded by an outbound call to the escort service's telephone number, from the same guest room the Casino Defendants' cameras then watched Chloe visit.

77. Most men who buy sex while in Las Vegas do not want to bring home evidence that their families or friends might find. Thus, they do not want their cell phone call histories to show that they called an escort service during their stays in Las Vegas.

78. It is therefore almost certain that many of the men who paid to victimize Chloe at each of the Casino Defendants' properties called the escort line from their guest room phones.

79. The Casino Defendants know every number called from every room phone in their casinos in real time, and they monitor outgoing lines for calls to specific numbers like 911.

80. During the time Chloe was forced to work for the escort service, it used no more than a handful of different telephone numbers, each of which was publicly advertised on the internet and displayed on flyers handed out on the Strip.

81. The Casino Defendants knew that Las Vegas escort service telephone numbers were publicly available on the internet and from the flyer-peddlers they walked past daily.

82. The Casino Defendants knew that escort services regularly dispatched women—most of whom they knew were likely coerced—to perform out calls in their casinos.

83. The Casino Defendants knew that their guests often placed calls to escort services using their guest room telephones.

84. The Casino Defendants would therefore have at least suspected, even without performing their own research, that certain telephone numbers frequently called from their guest room telephones belonged to escort services.

85.     This suspicion would have approached certainty as time passed and the increasing prevalence of cellphones meant fewer and fewer guests used their guest room telephones for any legitimate purpose.

86.     On information and belief, the Casino Defendants knew Chloe's escort services' telephone numbers, but they chose to permit outgoing calls to those numbers, and they chose to allow sex workers dispatched by the escort service—most of whom they knew were likely coerced—in the doors and up to callers' rooms by default.

87.     Additionally, it was standard practice for each of the escort services for which Chloe worked during her trafficking to call ahead to the front desks of the Casino Defendants' properties before sending Chloe on an out call.

88.     The purpose of these calls was to ensure that the client who had just requested an escort was really staying at the casino hotel where he claimed to be staying, and to confirm his room number.

89.     Every casino hotel to which Chloe was dispatched willingly answered these calls and transferred them to the requested guest room.

90.     On information and belief, front desk and security personnel at all five casinos became aware on multiple occasions that Chloe was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

91.     Such awareness would have been based not only on the clues listed above, but also on her clothing and aspects of her behavior, such as going directly to and from the elevators (on out calls) or hanging around the tables of high rollers in nightclubs while not yet of drinking age (walking the carpet).

92.     Because of Walter's notoriety as a "gorilla pimp," it is likely that at least some of the security employees at each of the casinos where Chloe did out calls knew that she was not selling herself willingly.

93.     Additionally, because the Casino Defendants' security employees were perforce more familiar with the sex industry than an average member of the public, they would have been aware that many, or even most, prostitutes are victims of severe coercion.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

11

94.     On information and belief, the employees knew Chloe was being trafficked.

95.     Nevertheless, the employees turned a blind eye to Chloe's plight because to do otherwise would have inconvenienced the employees and potentially upset her clients (and the casinos' guests) who often came to Las Vegas for its reputation for tolerating commercial sex.

96.     On information and belief, this willful blindness was intentionally fostered by the Casino Defendants in order to please their clientele and so pad their bottom lines.

97.     Additionally, this willful blindness was likely encouraged by the Casino Defendants' desire to draw a sharp line between acceptable "consensual prostitution" and human trafficking that in a way that places nearly all prostitutes on the "consensual" side of the line.

98.     On information and belief, to the extent that the Casino Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

<u>Lexington Nightmare (2011)</u>

99.     In early 2011, after about four months with Walter, a stranger reached out to Chloe on Facebook and offered to help her escape by flying her to meet him in Manhattan.

100.     Chloe would later learn that this man had a history with the same "friend" of hers who had tricked her into meeting Walter.

101.     At the time, however, Chloe leapt at the opportunity to escape.  She took the flight to New York and met the man—Oscar[4]—in his room in what was then the Radisson Hotel New York-East Side, a/k/a the Lexington Hotel, at 511 Lexington Ave., New York, NY 10017.

102.     Oscar was polite and respectful on the night Chloe arrived, but at 6AM the next morning he woke her by throwing a ringing phone at her and demanding that she answer it.

103.     He ordered her to say yes to whatever the caller wanted and have him to come to the room where they were staying.

104.     Chloe quickly realized Oscar was another pimp, and that he had already posted advertisements on the internet offering her for commercial sex.

---

[4] Oscar is a fictitious name, used for the same reasons given in fn. 3.

105. Again, she found herself alone in a room with a dangerous man, in a city she didn't know, being forced to choose between having sex against her will and upsetting someone who could beat her, throw her out without her few remaining possessions, or even kill her.

106. So, Chloe did what experience had taught her she needed to do to survive.

107. For the next four months, Chloe lived in the Lexington Hotel with Oscar, who kept hold of her possessions and identification documents and rarely let her out of his sight except when she was with a client.

108. During those four months, Oscar arranged at least one "in call" every day. On most days, Oscar forced Chloe to take about 10 "in calls." An "in call" is when a client meets a sex worker at her location—usually, as in Chloe's case, a hotel room.

109. Being forced to have sex with so many men was damaging, both physically and mentally, and Chloe suffered horribly every day.

110. Every time that a client arrived for an in call, Oscar left the room where he kept Chloe prisoner and waited in the lobby or the second-floor lounge, both of which are visible from the hotel's front desk due to the open layout of the Lexington's first two floors.

111. When each man left, Oscar promptly returned to the room to keep tabs on Chloe unless another client was due to arrive immediately.

112. Over a period of four months, the hotel's front desk staff would have seen this pattern of behavior from Oscar repeated many hundreds of times. Combined with the steady stream of male visitors to their room, it would have been almost impossible for either the Lexington's front desk employees or their managers to miss.

113. Additionally, Oscar physically abused Chloe, and on information and belief the signs of that abuse were visible to staff on at least one occasion.

114. The hotel's staff and managers would've seen other signs that Chloe was a victim of human trafficking, too, including:

    a.     The room's trash usually contained ten or more used condoms each day;

    b.     Someone in the room requested a fresh change of linens every day;

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

c.  Clients asked the front desk to direct them to Chloe's room on multiple occasions, and the front desk obliged;

d.  Security had to come to their room on several occasions after other guests complained about shouting matches and the smell of marijuana;

e.  When security came to the room, Chloe was always wearing lingerie;

f.  When Chloe left the room, she was always dressed in scanty outfits that were often inappropriate for the weather;

g.  Oscar left very generous tips for various hotel staff that were clearly intended to buy their silence;

h.  Oscar did not allow Chloe to speak to staff; and

i.  Chloe looked fearful and took care not to make eye contact with men other than Oscar.

115.  Chloe spent a total of eight months under Oscar's thumb—four in the hotel, and then another four in various New York apartments—before she managed to escape again during a brief trip to Florida and buy her own way back to New York.

116.  To this day, Chloe cannot go near the Lexington without starting to shiver involuntarily and risking a nervous breakdown.

### Priority Girls (2011–2013)

117.  After she escaped, Chloe spent several weeks living alone and making her own decisions for the first time in nearly a year.  Unfortunately, fear that Oscar would find her kept her largely confined to her tiny temporary apartment.  Soon enough her fear was realized: Oscar tracked her down at her apartment and began to stalk her aggressively.

118.  This time, when Chloe looked for somewhere to run, the best option she could find was a friend's offer to put her in touch with a man in Las Vegas—one who had the money and connections to put Oscar and Walter in their places if they came for her.

119.  That man was Defendant Jamal Rashid, a/k/a "Mally Mall," a prominent hip-hop producer and sometime rap artist who operated a nationwide escort service out of his swanky Las Vegas office—at least until it was raided by the FBI in late 2014.

120.  Rashid's escort service had three main elements:  A main office and call center/dispatcher in Las Vegas that operated practically in broad daylight; a group of between eight and twelve "Priority Girls" who belonged to Rashid and gave him 90% of every dollar they

earned; and a much larger group of loosely-associated girls who paid a smaller percentage to Rashid but were only dispatched on less lucrative jobs or when no Priority Girl was available.

121.    Rashid expected loyalty and praise from all of his girls, including the ones who ran his office and staffed the call center, but he demanded the most from his Priority Girls.

122.    Rashid was a sophisticated abuser who maintained control over his Priority Girls and his other employees by creating a cultlike atmosphere in which he was the exclusive source of rewards and the ultimate arbiter of punishments.

123.    To create the cultlike atmosphere he wanted, Rashid used a sophisticated combination of manipulative techniques, including:

a.    Showering Priority Girls with flashy clothes, jewelry, and other status symbols, while making it clear his "gifts" could be revoked in an instant;

b.    Requiring that all Priority Girls live together in pairs in apartments he controlled and paid for, so every girl always had someone watching them;

c.    Providing a single flashy car for each pair of Priority Girl roommates;

d.    Keeping the number of Priority Girls low and their membership ever-changing so they stayed pitted against one another—and every other girl in Rashid's orbit—in a constant battle for their place in his affections;

e.    Rewarding Priority Girls lavishly for bringing him tales about roommates who did anything that displeased him, such as saving money to leave;

f.    Giving every Priority Girl a new name and insisting they use it;

g.    Making extravagant promises to "set up" Priority Girls who worked hard for him so they could retire in luxury;

h.    Dangling before every Priority Girl the possibility that he'd marry them;

i.    Keeping 90% of what the Priority Girls earned, so that they often needed him to pay even for necessities;

j.    Setting a $500 daily cap on Priority Girls' retained earnings, to ensure they never got enough money at one time to buy a plane ticket;

k.    Making Priority Girls, especially those whose own positions were in jeopardy, do the dirty work of beating and evicting ex-Priority Girls who had displeased him; and

l.    Telling stories, and encouraging his Priority Girls to share stories, about horrific abuses and murders inflicted on girls who disobeyed their pimps.

124. Terrified that Oscar would drag her back to her prison in the Lexington, and lacking any better options, Chloe let Rashid buy her a plane ticket back to Las Vegas.

125. When Chloe arrived, she was taken to meet Rashid and his Priority Girls at a club.

126. The Priority Girls, ever fearful of criticizing Rashid and losing their positions, talked up his virtues and told stories of the gifts he gave and the promises he made to them.

127. Chloe half-believed Rashid's and the Priority Girls' promises of a good life full of easy money and ending in a luxurious retirement. And besides, she desperately needed security.

128. So when Rashid told Chloe to get in a car with a Priority Girl named Cassie,[5] she obeyed. Over the next three years, Cassie would be Chloe's roommate and constant shadow, and Chloe would live and work as one of Rashid's most prized Priority Girls.

129. Young and maltreated as she was, Chloe lacked experience of anything like a healthy living situation to measure her new life against.

130. The brainwashing imposed by Rashid's personality cult soon changed her almost completely. She answered only to her new name, and for a while she even forgot her old one.

131. During the time Chloe spent as one of Rashid's Priority Girls, she was required to perform frequent out calls in nearly every Las Vegas casino and hotel.

132. In particular, the escort service dispatcher sent Chloe to perform out calls for men staying in the Wynn, the Aria, the Cosmopolitan, the MGM Grand, and the Caesars dozens of times each.

133. During Chloe's time under Rashid's control, the Casino Defendants would have had access to all of the same clues showing Chloe's victimization that they had during her earlier time with Walter.

134. Nevertheless, the Casino Defendants welcomed Chloe into their casinos and permitted her to go up to their private guest rooms to meet wealthy guests dozens of times each over this three-year period.

135. Rashid's escort line was so prolific that the front desks at the Wynn, the Aria, the Cosmopolitan, the MGM Grand, and the Caesars each likely received an average of two to three

---

[5] Cassie is a fictitious name, used for the same reasons given in fn. 1.

calls per day seeking to confirm that prospective clients were staying in their hotels and obtain the clients' room numbers.

136. Rashid's escort line, like all escort lines for which Chloe worked, employed a limited number of "phone girls" and used stable phone numbers for extended periods.

137. Only a willfully obtuse front desk worker could have failed to understand the purposes of the frequent calls they received from the same numbers with same female voices asking the same questions.

138. **The Mansion at MGM Grand** was perhaps the most lucrative location to which Chloe was regularly dispatched by the escort line.

139. The Mansion is a four-star hotel—associated with and operated as part of the MGM Grand—where MGM Grand managers personally cater to high-rollers' every whim.

140. When Chloe and other Priority Girls would arrive at the Mansion, they would park in a detached parking lot where they would be met by an MGM Grand manager, usually Carl Clayton, who handled guest satisfaction at the Mansion from 2013–2021.

141. Mr. Clayton (or, less often, another employee) would personally walk Chloe and other Priority Girls to the villa where the guest who had called the escort line was staying.

142. When Chloe performed out calls at the Mansion, she usually stayed only a few hours before leaving, sometimes escorted back to her car by Mr. Clayton or another employee.

143. Often, the same guests would request that Chloe be dispatched to them multiple times during a single stay, and each time this process would repeat.

144. On at least one occasion, Mr. Clayton entered a room to deliver room service and interrupted the guest and Chloe having commercial sex.

145. Mr. Clayton knew that Chloe was under the control of Jamal Rashid.

146. In fact, Rashid stayed at the Mansion at least twice during this period, and he made Chloe and several other girls he controlled stay with him on at least two occasions.

147. Mr. Clayton witnessed this, and he knew that Chloe and the other girls were associated with Rashid for several reasons, including body language, terms of address, and the fact that Rashid arrived with "his" girls rather than needing to order girls from an escort line.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

148. Mr. Clayton would also likely have had access to call records from guest villas showing that before each of Chloe's visits, the guest had placed a call to Rashid's escort line.

149. Other MGM Grand employees would have witnessed the same patterns as Mr. Clayton and come to the same conclusions.

150. Mr. Clayton and other MGM Grand employees helped guests at the Mansion obtain commercial sex with far more girls than just Chloe, or even just those controlled by Rashid. Guests ordering escorts was a more-than-daily occurrence.

151. Mr. Clayton and other MGM Grand employees' behavior in assisting Chloe's trafficking was far from anomalous—it was company policy and an important part of keeping their most lucrative guests happy.

152. Although Chloe visited the Mansion at MGM Grand most frequently during her time under Rashid's control, she was dispatched for commercial sex with at least two separate clients at the Mansion during 2015–2017.

<u>Walking the Carpet (2011–2013)</u>

153. When the escort service dispatcher didn't have enough clients to keep Chloe busy performing out calls, Rashid expected her to walk the carpet and keep his money flowing in.

154. Rashid told Chloe to follow the examples of his other Priority Girls and offer kickbacks to employees and managers of the Casino Defendants and the Captive Business Defendants, many of whom could help her avoid removal from the premises and connect her with potential clients.

155. **STK Steakhouse**, located inside the Cosmopolitan, prides itself on its "flirty, bustling bar scene" and "sexy vibe." *STK*, COSMOPOLITAN OF LAS VEGAS, *available at* https://cosmopolitanlasvegas.com/restaurants/stk (last accessed Nov. 9, 2023).

156. Part of that vibe comes down to the steakhouse's longtime manager, who was famous among the Priority Girls for his willingness to let sex workers sit at his bar to pick up clients—often for hours at a time and days in a row—so long as they bought a few drinks and gave him a cut of their earnings.

157. Sometimes, he would even point potential clients in the girls' direction, or tell the girls that he had a potential client at a particular table.

158. Thanks to the manager's toleration and assistance, Chloe alone picked up at least 50 clients inside STK Steakhouse between 2011 and 2017, mostly concentrated during her time as a Priority Girl from 2011 through mid-2013.

159. The manager's business relationships with Chloe and other girls were so regular that he generally allowed them to pay him his cut on a weekly basis rather than after each individual client.

160. **XS Nightclub**, located inside of and operated by Wynn, provides an "intimate environment" that's "[i]nspired by the sexy curves of the human body." *XS*, WYNN LAS VEGAS, *available at* https://www.wynnlasvegas.com/nightlife/xs-nightclub (last accessed Nov. 9, 2023).

161. XS Nightclub is entered by walking between long gilded friezes depicting dozens of naked women struggling to break free from the sheets that imprison them. In other words, XS Nightclub unabashedly targets the kind of clientele that sees sexual exploitation as one of Las Vegas's main attractions.

162. Unsurprisingly, many of the hosts who oversee the club's nightly dance parties and special events were just as eager as STK's manager to connect Priority Girls (and other sex workers) with men looking to buy.

163. During her time as a Priority Girl, Chloe gave her phone number to, or was given a phone number by, several different hosts who worked at XS Nightclub. That allowed her to text hosts to ask if a given event had any likely-looking clients in attendance, and it allowed the hosts to text her whenever they noticed high rollers looking lonely.

164. The hosts—and the Wynn—benefitted greatly from these connections with Chloe and other sex workers because the lure of commercial sex was the key to keeping many of the club's high rollers happy and spending and eager to come back soon.

165. Nevertheless, the hosts Chloe worked with also demanded an under-the-table cut of any money she made from clients picked up in the club.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

19

166. Chloe rarely entered XS (or any other other nightclub) on her own initiative—she almost always came because she had been invited by a host employed by the nightclub operator for the purpose of satisfying guests' desire for commercial sex.

167. Thanks to the invitation and assistance of several different hosts, Chloe alone picked up at least 50 clients inside XS Nightclub between 2011 and 2017, mostly concentrated during her time as a Priority Girl from 2011 through mid-2013.

168. **Haze Nightclub**, located inside the Aria, was another welcoming environment in which to trawl for commercial sex work.

169. As with XS Nightclub, several hosts at Haze Nightclub were eager to help Chloe and other girls connect with potential clients, both because it pleased their clientele and because they stood to make out handsomely from the kickbacks.

170. Again like XS, several of the hosts exchanged phone numbers with Chloe and other sex workers to make it easier to connect lonely high rollers with girls who were for sale.

171. Thanks to the invitation and assistance of several different hosts, Chloe picked up about 20 clients inside Haze Nightclub between 2011 and mid-2013.

172. **Marquee Nightclub**, located inside the Cosmopolitan, was another welcoming environment in which to trawl for commercial sex work.

173. As with XS Nightclub, several hosts at Marquee Nightclub were eager to help Chloe and other girls connect with potential clients, both because it pleased their clientele and because they stood to make out handsomely from the kickbacks.

174. Again like XS, several of the hosts exchanged phone numbers with Chloe and other sex workers to make it easier to connect lonely high rollers with girls who were for sale.

175. On several occasions, Derek Runtas, a host employed by Tao Group to run events at Marquee Nightclub, directed Chloe to tables where high-rollers were partying and where he knew or suspected that the high-rollers were looking to purchase commercial sex.

176. During 2015–2017, Chloe usually visited Marquee Nightclub in the company of another sex worker who frequented the location, and who would also be invited by hosts.

177. Mr. Runtas likely texted Chloe or the other sex worker prior each occasion.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

20

178.   Each time such a referral resulted in a commercial sex transaction, Chloe would have paid Mr. Runtas a kickback representing a significant fraction of her earnings.

179.   Chloe visited Marquee less often than XS, especially early in her trafficking. With the invitation and assistance of several different hosts, Chloe picked up about 15 clients inside Marquee Nightclub between 2011 and 2017, with about half of those occurring during 2015 through 2017.

180.   **OMNIA Nightclub**, located inside the Caesars, was another welcoming environment in which to trawl for commercial sex work.

181.   As with XS Nightclub, several hosts at OMNIA Nightclub were eager to help Chloe and other girls connect with potential clients, both because it pleased their clientele and because they stood to make out handsomely from the kickbacks.

182.   Again like XS, several of the hosts exchanged phone numbers with Chloe and other sex workers to make it easier to connect lonely high rollers with girls who were for sale.

183.   On several occasions, Andreas Vasilu, a host employed by Tao Group to run events at OMNIA Nightclub, directed Chloe to tables where high-rollers were partying and where he knew or suspected that the high-rollers were looking to purchase commercial sex.

184.   During 2015–2017, Chloe usually visited OMNIA Nightclub in the company of another sex worker who frequented the location, and who would also be invited by hosts.

185.   Mr. Vasilu likely texted Chloe or the other sex worker prior to each occasion.

186.   Each time a referral resulted in a commercial sex transaction, Chloe would have paid Mr. Vasilu a kickback representing a significant fraction of her earnings.

187.   Chloe visited OMNIA less often than XS, especially early in her trafficking. With the invitation and assistance of several different hosts, Chloe picked up about 15 clients inside OMNIA Nightclub between 2011 and 2017, with about half of those occurring during 2015 through 2017.

188.   In addition to walking the carpet in casino nightclubs and restaurants, Chloe also picked up many clients on the gaming floors of the Casino Defendants' casino properties. Often, she picked up two or more clients in a row from the floor of the same casino without leaving.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

189.     Often, when picking up clients on a gaming floor, Chloe would sit at one of the slot machines nearest the elevators and wait there, stretching a few dollars over minutes or even hours, until a potential client approached her and then took her to his room.

190.     Tourist men looking for commercial sex were able to identify Chloe as a sex worker from her appearance and the location she chose on the gaming floor dozens of times during her trafficking, including multiple instances at each of the Casino Defendants' casinos.

191.     On information and belief, the Casino Defendants' gaming floor employees were at least as good at identifying sex workers as men from out of town, and they therefore knew Chloe was a sex worker whenever she waited at a slot machine near the elevator.

192.     Additionally, each of the employees of the Captive Business Defendants who took kickbacks from Chloe would have learned that Priority Girls like Chloe brought in a minimum of a thousand dollars per client.

193.     Each of the employees would also have seen from the girls' frequent appearances that Chloe and other Priority Girls were expected to pick up far more clients than they would've needed or wanted if they were allowed to keep a meaningful portion of their earnings.

194.     So, each of the employees either realized or should have realized that Chloe and the other Priority Girls were victims of trafficking because such a lopsided arrangement strongly indicated the use of coercion and/or fraud.

195.     Given the frequency with which they interacted with sex workers, the manager at STK, several of the hosts at XS, Haze, Marquee, and OMNIA, and many of the Casino Defendants' gaming floor and security employees would have been very familiar with the commercial sex industry.

196.     On information and belief, the manager, hosts, and other employees were also familiar enough with the commercial sex industry to know that very few sex workers get into their line of work willingly or remain in it without being coerced.

197.     On several occasions, Rashid brought Chloe and several other Priority Girls with him when he gambled at the Casino Defendants' properties, where he expected his scantily clad girls to compete for his attention by waiting on him hand and foot.

198.    No reasonable observer of the dynamic between Rashid and the Priority Girls could have believed that it did not involve some form of fraud or coercion on Rashid's part.

199.    Rashid used Chloe and for this sort of vulgar display at least once on the gaming floor of the Aria.

200.    On information and belief, Rashid used Chloe for this sort of vulgar display at least once on the gaming floors of the Wynn and the Caesars.

201.    As one of the most prominent music industry figures based in Las Vegas, Rashid was well-known around Las Vegas, particularly in the nightclub scene.

202.    His escort service and his control over the Priority Girls were also widely known among regular participants in the Las Vegas nightclub scene.

203.    On information and belief, the manager at STK and several of the hosts at XS, Haze, Marquee, and OMNIA knew about Rashid and his relationship to the Priority Girls either from experience or by reputation, so they knew that he kept the girls in thrall using a mixture of coercion and fraud.

204.    Nevertheless, they continued to take kickbacks in exchange for connecting Chloe and other Priority Girls with men looking to pay for sex.

205.    Similarly, during Chloe's later trafficking by Walter, the employees to whom she paid kickbacks knew that she was controlled by a pimp.

206.    Once, a nightclub host dissatisfied with the kickback Chloe paid managed to locate Walter and contact him directly to complain.

207.    Walter met with the dissatisfied nightclub host personally to pay him off.

208.    He also beat Chloe for causing the problem in the first place.

209.    Taking kickbacks was so pervasive among the Casino Defendants' employees and among hosts in their captive nightclubs that it is inconceivable the Casino Defendants could have been unaware of it.

210.    Additionally, on reference, the scientific literature regarding sex work and sex trafficking was already replete with discussions of the crucial enabling role played by employees

at Las Vegas casinos.  Pimps, prostitutes, and the employees themselves all emphasized the importance of these employees' role as go-betweens in the commercial sex industry.

211.   The Casino Defendants and Captive Business Defendants were thus aware that many of their employees took kickbacks in exchange for facilitating commercial sex acts, and they were aware that this permissiveness would help sex traffickers turn a profit.

212.   On information and belief, these Defendants considered the willingness of their bar and nightclub employees to take kickbacks to be a net positive because it allowed them to tacitly permit commercial sex work in their casinos—meaning they could continue to attract some of their most lucrative visitors—while also letting them underpay certain employees.

213.   On information and belief, these Defendants therefore refrained from punishing employees who took kickbacks, so long as those employees only turned blind eyes to the sort of quiet, clean-looking sex workers who did not interfere with other guests' experiences.

214.   Additionally, on information and belief, the Casino Defendants and Captive Business Defendants were each aware that a specific employee had demanded and received kickbacks from Chloe, but they chose not to act on that information.

215.   The Casino Defendants' and Captive Business Defendants' employees who took kickbacks from Chloe did so, in large part, because they understood (correctly) that their job was to keep guests happy, and that for certain male guests attracted by the casinos' sexualized image, connecting them to sex workers was an important part of keeping them happy.

216.   No one who works in hospitality in Las Vegas can do so for long without gaining the ability to quickly identify sex workers with a high degree of confidence.  If nothing else, everyone quickly notices that attractive, scantily clad, made-up young women they find sitting alone almost never order anything for themselves.

217.   On information and belief, the Casino Defendants' and Captive Business Defendants' employees were thus quite familiar with commercial sex workers, and they therefore understood that Chloe and the other Priority Girls were likely being trafficked.

218.    Nevertheless, the employees turned a blind eye to their plight because to do otherwise would have inconvenienced the employees and potentially upset her clients (and the casinos' guests) who often came to Las Vegas for its reputation for tolerating commercial sex.

219.    On information and belief, this willful blindness was intentionally fostered by the Casino Defendants in order to please their clientele and pad their bottom lines.  To do otherwise would have placed them at a competitive disadvantage vis-à-vis more permissive casinos when it comes to attracting the high rollers who account for much of their revenue.

220.    In the alternative, the employees properly reported their suspicions up the chain, but Defendants' higher management simply chose not to take action in order to please their clientele and protect their bottom lines.

221.    In addition to having Chloe walk the carpet and sending her on out calls in Las Vegas, Rashid occasionally dispatched Chloe and Cassie to particularly lucrative clients in locations around the country.

222.    In one notable incident in about early 2013, Rashid sent Chloe and another Priority Girl to New York City to meet a high-paying client.  Unbeknownst to Chloe, Rashid booked them a room in the Lexington Hotel.

223.    During this stay in the Lexington Hotel, any employees who had been there since 2011 would likely have recognized Chloe and understood from their clothing and behavior why she and her roommate were there.

224.    Any such employees therefore knew, or should've known, that Chloe being trafficked for sex.

225.    Nevertheless, they made no effort to help her.

226.    In fact, it turned out that they were still doing business with her former trafficker Oscar, and they were apparently inclined to take his side.

227.    A week into her stay, Chloe unexpectedly encountered Oscar at the ground floor elevators.  He grabbed for her and chased her through the lobby and out of the building, yelling and cursing, without drawing any interference from the hotel's staff.

228. Chloe was eventually able to lose Oscar, but she had to relocate to another hotel. On information and belief, he then returned to the Lexington Hotel and was permitted to continue his stay.

Out of Pocket (2013–2014)

229. At some point in mid-2013, Rashid made the mistake that eventually brought down his entire operation—he sent Chloe to meet a client in Wisconsin.

230. When Rashid sent Chloe and her roommate Cassie off to Wisconsin, he did not tell them that the deal was anything other than a lucrative out call.

231. When they arrived, however, they learned that the client had paid somewhere north of $100,000 for them, and that he believed that he now owned both Priority Girls outright.

232. The man was a highly paid executive in the midst of a drug- and alcohol-fueled spiral. It would later turn out that he had embezzled the money used to purchase Chloe and Cassie. It was that embezzlement investigation that eventually led law enforcement to Rashid.

233. Chloe's new "owner" smoked crack cocaine in her presence and generally seemed erratic and dangerous, but he didn't have the determined vengefulness of the other men who'd claimed to own Chloe.

234. After a few days, his erratic behavior convinced Chloe she would be safer if she ran. Unfortunately, that meant evading not just him but also Cassie who might try to stop her.

235. Chloe fled with just a single suitcase, leaving behind nearly all her worldly possessions, including the social security card that Rashid insisted on keeping himself.

236. Gambling that Rashid would not follow her, she somehow made her way back to New York, where she would spend several fearful months in hiding from Rashid, Walter, and Oscar while trying to shake off Rashid's spell and the recover from the trauma of her recent past.

237. Unfortunately, she found that she was unable to make ends meet. Having spent her adult life so far as an involuntary sex worker, she found she had no other marketable skills. And when she tried sex work in desperation, even that failed to support her in New York City.

238. So, Chloe returned to Las Vegas, where her situation continued to deteriorate.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

239.     Things got so bad that she became nostalgic for her time with Walter.  She kept remembering how Walter had given Jenny her own car, as if that made up for everything else.

240.     Eventually, in about early 2014, desperation won out, and Chloe called Walter to ask for help.

Through the Fire (2014–17)

241.     It wasn't long before Chloe wished could take that decision back.

242.     Walter, she soon realized, had been gentle with her before.  She had been young and vulnerable, and he had restrained himself to protect his investment.

243.     Now, physical violence was just another means of getting his point across.

244.     Under Walter's constant supervision, Chloe returned to her old routine.  She signed up to do out calls for a new escort service, and she started walking the carpet again.

245.     For another three years, she walked in and out of all five of Casino Defendants' properties, performing out calls and sometimes paying kickbacks to pick up clients at STK Steakhouse, XS Nightclub, Marquee Nightclub, and OMNIA Nightclub.

246.     During this time, the Casino Defendants and Captive Business Defendants would have had access to all of the same clues showing Chloe's victimization that they had during her time with Rashid and her earlier time with Walter, and many of their employees would have already been familiar with her from her frequent visits in earlier years.

247.     The purpose of her visits was obvious for the same reasons it had been then, although now she sometimes sported bruises or limped as security personnel and casino cameras watched her walk through security and take the elevators to a guest room, which made her status as a victim of trafficking even more obvious.

248.     Still, the Casino Defendants' security staff and other employees continued to allow her to enter their properties to engage in commercial sex with their guests.

249.     For just one example, Carl Clayton at the Mansion could not have helped but notice Chloe's distressed appearance compared to her visits while under Rashid's control.

250. During this time, Chloe lived within blocks of the Encore (attached to and operated by the Wynn), so she typically ended her night gambling small amounts of money near the elevators at the Encore and trying to pick up clients.

251. When walking the carpet and picking up clients at the gaming tables, Walter insisted that Chloe tip the dealer at whose table she met the client when she came back down so as to stay in the dealer's good graces.

252. Wynn employee and dealer Mariah Majana was often working in the Encore in the wee hours of the morning when Chloe was winding down her night.

253. Ms. Majana alone witnessed at least ten instances of a pattern where Chloe met a new client while gambling at a table, went upstairs with the client, came back down to the table not much later, and then tipped the dealer at that table.

254. Wynn employee and pit boss Drew Townsend also witnessed this same pattern on numerous occasions at other times of day.

255. One of the dealers Chloe tipped in this fashion was Mark McDuffie.

256. Chloe also met clients frequently at the Caesars during this time. From 2015–2017 she met clients for commercial sex at the Caesars between ten and a hundred times.

257. Chloe met clients less frequently at other casino properties during this period, but she met at least a few clients each at the Aria, the Cosmopolitan, and the MGM Grand from 2015–2017.

258. Four months after Chloe returned to Walter, he got her pregnant against her will.

259. Walter knew that the pregnancy would make it almost impossible for Chloe to leave, so he grew even more physically violent.

260. After Chloe gave birth, Walter controlled her access to her newborn son, restricting access to motivate her to make more money, and even hiding her son to punish her.

261. He also used this new leverage to compel Chloe to travel to other cities to engage in sex work, secure in the knowledge that she would return to her son.

262. During the first two years of her son's life, Chloe tried twice to escape with him.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

263. Once, Walter caught her almost immediately. The other time, she managed to evade him for a few days before he tracked her down.

264. Each time, her punishment included Walter holding a gun to her head and threatening to blow her brains out in front of her son.

265. In about 2017, when her son was a bit more than two years old, Chloe managed to secretly rent an apartment in New York City while she was working there on Walter's orders.

266. After persuading Walter to bring her son to visit her for Easter, she managed to sneak past him as he slept, snatched her son like a thief in the night, and went to ground in her secret apartment.

267. Although it would be a long time before she could allow herself to believe it, this time she really got out.

## Free at Last?

268. Since her escape from Walter, Chloe has managed to remain free from direct control by traffickers, but that doesn't mean she is entirely free.

269. Although Defendant Rashid was arrested in 2014, his criminal proceedings did not resolve until his guilty plea in 2020. Defendant Rashid has since been released.

270. Walter and Oscar, so far as Chloe knows, remain at large.

271. When she took her son and ran, Chloe had spent less than a year of her adult life outside of the control of a trafficker—nearly all of it in hiding from her former traffickers.

272. She has therefore spent the years since impoverished, working hard to keep herself and her son fed, clothed, housed, and most of all safe.

273. It has been a grinding struggle trying to raise a young child alone, with limited education and no job experience, while suffering the omnipresent mental and emotional aftereffects of an adult life spent in virtual slavery and subjected to horrible abuse.

274. In late 2018 or early 2019, more than a year after she escaped from Walter, a friend introduced Chloe to an acquaintance who worked with victims of abuse.

275. That conversation is the first time that Chloe can recall anyone treating her as a victim. It wasn't until this first time she heard someone else say that she had been mistreated that she was able to begin to think that way herself.

276. During the years she spent controlled by or in hiding from Walter, Ocean, and Rashid, she believed that what was happening to her was normal. It was just "the Life."

277. This belief was actively created and reinforced by Walter, Ocean, and especially Rashid using various combinations of browbeating, storytelling, and physical violence.

278. Since escaping, Chloe has only gradually realized how wrong the things done to her were, and she has only gradually come to understand the damage her trafficking did to her.

279. In the past several years, Chloe has been diagnosed with PTSD and she is in ongoing treatment for PTSD, dissociation, and memory loss.

280. All three of these conditions interfered with her ability to recognize that she had been injured, realize the source of her injury, or take action to get justice.

281. During her time with Rashid, Chloe's identity was taken away from her, and it only gradually returned. She thought of herself as a different person with a different name for more than three years.

282. Ocean and Walter, meanwhile, inflicted significant head trauma on Chloe that interfered with and continues to interfere with her ability to form and recall memories.

283. All three contributed to her extreme PTSD, which makes it even more difficult for her to recall details of her suffering, and which makes the process very painful because it tends to trigger flashbacks.

284. For much of the time since she escaped, entire years of her life—especially her time with Rashid—were missing or fragmented. Large sections of her memory still are.

285. Moreover, until very recently, Chloe believed that by performing commercial sex inside the Casino Defendants' properties she had been "getting away with" something, rather than doing exactly what they wanted her to do.

286. She thus did not realize that the Casino Defendants were the source of her injuries until well after she escaped from Walter for the second time.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

287. As for the Lexington, she had believed that Ocean had been "getting away with" something by trafficking her there, when in fact his conduct was welcomed by the Lexington.

288. Again, it was not until after she escaped from Walter for the second time that she realized the Lexington Defendants were the source of her injuries.

289. Under the federal common law discovery rule applied to federal statutory causes of action, a plaintiff's claim accrues when she "knows or has reason to know of the injury that is the basis of the action *and* the cause of that injury." *Gregg v. Dep't of Pub. Safety*, 870 F.3d 883, 885 (9th Cir. 2017) (citations omitted) (applying discovery rule in sexual abuse case against psychiatrist where plaintiff needed years to recognize upsetting sexual abuse as "injury" because she believed it had been treatment); *see also Estate of Jackson v. City of Modesto*, 2021 U.S. Dist. LEXIS 199638, at *27–27 (E.D. Cal. Oct 14, 2021) (applying discovery rule to *Monell* claim, but not excessive force claim, where plaintiff was aware of her injury and the officers who inflicted it, but was not aware of the city policy that caused them to inflict the injury).

290. Only after Chloe made contact with her present counsel did she finally begin to believe that anyone in the legal system might take her suffering seriously.

291. Even so, it took several long talks before Chloe began to believe that justice was even possible—though nothing short of justice delivered will ever fully dispel her doubts.

292. After she retained present counsel, Chloe diligently participated in the preparation of her complaint, which was filed less than a week later.

Disneylands for Sex Tourists

293. The Wynn, the MGM Grand, and most other Las Vegas casinos are loyal heirs to a longstanding tradition of Strip casinos welcoming sex tourism to pad their bottom lines, as described in the introduction at paragraphs ¶¶ 7–21, *supra*.

294. Just beneath the surface at each of the Casino Defendants' properties is a commercial sex theme park built and operated with knowledge, intent, and considerable skill.

295. The Casino Defendants semi-deniably target advertisements toward sex tourists through the LVCVA, thereby turning their gaming floors into concentrated pools of demand for commercial sex.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

296.    When traffickers bring their victims to Las Vegas to meet that demand, the Casino Defendants allow the most desirable of those victims to sell sex on their gaming floors and in their guest rooms, while excluding any whom they deem undesirable—such as those who steal from guests or make scenes—to create a curated sex tourism experience for their guests.

297.    The Casino Defendants also generally exclude known pimps—at least until the pimps become successful enough to gamble in the high limit room like Rashid.  This further increases the quality of the sex tourist guest experience because most johns are nearly as frightened of pimps as the pimps' own victims are.

298.    Most importantly, the Casino Defendants use their considerable leverage over the LVMPD and local politicians to ensure that the LVMPD concentrates its enforcement efforts exclusively on the supply side of the commercial sex equation, at least within their properties. By doing so, they ensure that, for sex tourist guests, "What happens in Vegas, stays in Vegas."

299.    These policies, plus tacit encouragement to their low-level employees like front desk workers and nightclub hosts to discreetly facilitate the sex trade, make the Casino Defendants' properties some of the best places in the world to buy sex—and that's the point.

300.    Public-facing guest reviews give some idea of how prevalent and openly tolerated sex work is within the Casino Defendants' properties.

301.    The following public reviews of the Wynn were left on TripAdvisor before or during Chloe's trafficking at the Wynn from 2011–2017:

    a.    One guest awarded 5 out of 5 stars in a review titled "Wynn Win Situation," in which she described the casino as "crawling with hookers" and complained that when she complained to security about her husband being propositioned, security "just laughed it off."  She concluded, "I know this is something that maybe lots of men look for so it's just another service provided but there should be another way of doing it that's not so obvious or crude."

    b.    Another guest awarded 3 out of 5 stars, stating, "we found in the elevator lobbies, drunk people, prostitutes bargaining with customers and so on."

    c.    Another guest awarded 4 out of 5 stars in a review titled "Hookers Welcome Here," where they complained of "hookers fighting in the halls."

    d.    Another guest awarded 2 out of 5 stars and said, "the strip is now loaded with prostitutes day in and day out.  I am not a prude, but come on Wynn, get them out of the casino!!!"  She continued, "in the morning security

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

guards were questioning 'hookers' who had just finished servicing some clients . . . Why don't they stop them from going up the elevators before they service their clients or get them to turn over their clients names…...then band [sic] them from the hotel."

e.    Another guest awarded 3 out of 5 stars and said, "I must share that you can easily identify the 'escorts' after nightfall, but we had fun picking them out of the crowd."

302.    More recent reviews of the Wynn reveal that their toleration of open sex work continues:

a.    In 2018, one guest awarded 1 out of 5 stars, complaining, "There were prostitutes all around in the casino and on the hotel room floors????? Security is terrible. Since they allow this to happen the security must be in on the prostitutes profit."

b.    In 2020, another guest awarded 2 out of 5 stars, saying, "The one thing that completely ruined the weekend for me was the escort/prostitute that tried to proposition me as soon as I hit the casino floor. . . . The Wynn Resort and Casino are 5 star rated and to have this happen to me was extremely disappointing. Why do you allow/condone the practice of escorts propositioning your guests in your place of business?"

303.    The following public reviews of the MGM Grand were left on TripAdvisor before or during Chloe's trafficking at the MGM Grand during 2011–2017:

a.    One guest awarded 3 out of 5 stars, reminiscing, "One of our favorite experience[s] from the trip was drinking at whiskey down bar and watching a spectrum of high-class hookers try to turn tricks with the lonely clientele."

b.    Another guest awarded 3 out of 5 stars, stating, "the amount of hookers around the casino floor was obscene!"

c.    Another guest awarded 2 out of 5 stars, stating, "Late nights the casino is filled with hookers and drug dealers approaching potential customers, hotel security seems not concerned."

d.    Another guest awarded 4 out of 5 stars, mentioning "There were tons of hookers...tons. About 7-10 of them would hang out by the elevators...Security and slot attendants were very aware that they were there...We kept a good eye on their pimps, too. Very easy to point out."

e.    Another guest awarded 2 out of 5 stars, wondering "Where was security?" when her "husband [got] propositioned by a hooker"

304.    More recent reviews of the MGM Grand reveal that their toleration of open sex work continues:

a.    In 2022, one guest gave 1 out of 5 stars and complained, "The casino floor was littered with prostitutes.  They hangout around the hallways going to

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

the elevators and try hooking men headed up. Security was completely oblivious to it almost as if it was part of their business plan."

b.   In 2024, another guest gave 1 out of 5 stars and complained, "there were prostitutes everywhere looking for John's. I get that Las Vegas allows prostitution, but i've been going there since I was 15 years old, and I'm 41. I've never seen it so incredibly out in the open an obvious. They were literally hookers everywhere. It was disgusting."

305.   Although the Casino Defendants do exclude some sex workers from their properties—or even turn them over to the LVMPD—as part of their balancing act setting the desires of their more family-oriented guests against those of their (usually much more lucrative) sex tourist guests, they rarely or never subject their sex tourist guests to similar treatment.

306.   This is not mere speculation. There is no other possible explanation for the ratio between the number of prostitutes arrested and the number of johns arrested on the Casino Defendants' properties.

307.   Prostitution is a crime where it very much "takes two to tango." In theory, then, roughly equal numbers of men and women should be arrested for and charged with soliciting or engaging in prostitution.

308.   Indeed, when one considers that most prostitutes are coerced into sex work, one might reasonably hope that more men than women would be charged with soliciting or engaging in prostitution.

309.   Sadly, the world is rarely fair to sex workers. In reality, the LVMPD arrests considerably more women than men for soliciting or engaging in prostitution.

310.   Specifically, during the seven-year period from the beginning of 2011 through the end of 2017, the LVMPD made 1,053 arrests leading to charges for soliciting/engaging in prostitution inside the primary Zip Code for the Las Vegas Strip, namely Zip Code 89109.

311.   Of those 1,053 arrests, 998 were made inside of Strip casinos, and 55 were made somewhere other than inside a Strip casino.

312.   Of the 55 arrests made outside of casinos, 20 of the arrestees were male, and 35 were female. Thus, **36% of all non-casino arrestees were male, and 64% were female**.

313.    A female-to-male arrest ratio of almost 2:1 seems unfair—indeed, *is* unfair—for a crime that almost always involves one perpetrator of each gender.  But compared to the gender ratio for in-casino prostitution arrests, a gender ratio of 2:1 seems practically utopian.

314.    Of the 998 arrests leading to charges for soliciting/engaging in prostitution made inside Strip casinos from 2011 to 2017, 28 of the arrestees were male, and 970 were female.  Thus, **2.8% of all in-casino arrestees were male, whereas 97.2% were female**.

315.     In other words, during the period when Chloe was trafficked in Defendants' properties, men who solicited prostitutes inside Strip casinos were at least ten times less likely to face prosecution than men who solicited prostitutes on the Strip outside of a casino.

316.    In fact, the situation is even worse because all but five of the men arrested inside strip casinos were themselves prostitutes, meaning **the prostitute-to-john ratio among arrestees was actually 993-to-5, or nearly 200-to-1**.

317.    This did not happen—and could not have happened—by accident.  Instead, it is almost certainly the result of two factors, both of which are fully under the control of the casinos themselves:

      a.    Although casinos regularly report undesirable sex workers and trafficking victims to the LVMPD and assist in their arrests, the same casinos never— or at least very, very rarely—do the same for the many male guests whom they witness soliciting commercial sex; and

      b.    Casinos discourage the LVMPD officers from arresting male guests on their own initiative using persuasion, cajolery, and threats (whether explicitly or implicitly) to withhold cooperation with LVMPD stings.

318.    In this way, Las Vegas casinos intentionally create an environment where the legal penalties for sex tourism apply exclusively or almost exclusively to the women victimized by it.

319.    They do this for the same reason they created "What happens here, stays here"— because they understand that the prospect of consequence-free sex tourism is one of Las Vegas's major draws, particularly for the casinos' prime demographic of older, wealthier men.

320.   This is not merely an inference based on public records.  According to Sgt. Donald Hoier (Ret.), who was the head of the LVMPD Vice division's Pandering Investigations Team during the time Chloe was trafficked, it was common knowledge among Vice officers that johns were not to be arrested on casino property.

321.   Moreover, according to Sgt. Hoier, on the one occasion that he arrested johns inside of a casino, he was told by the casino's head of security that if he did so again, the casino would withhold cooperation with future Vice efforts.

322.   The Wynn and the MGM Grand are both located within Zip Code 89109 such that they are covered by the same public records data described above.

323.   Between the beginning of 2011 and the end of 2017, 53 people were arrested at the Wynn and charged with soliciting or engaging in prostitution. Of those, only a single arrestee was a john.

324.   Between the beginning of 2011 and the end of 2017, 137 people were arrested at the MGM Grand and charged with soliciting or engaging in prostitution.  Of those, only one arrestee might've been a john (the LVMPD claims to be unable to produce that arrest record).

325.   In other words, between the Casino Defendants' properties, neither had a prostitute-to-john arrest ratio lower than 50-to-1, and one (the MGM Grand) may have had zero john arrests during the entire seven-year period.

### COUNT I: 18 U.S.C. § 1595 ("TVPRA")

326.   Plaintiff incorporates each foregoing and subsequent allegation.

327.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

328.   Through his acts and omissions described above, Defendant Rashid is a "perpetrator" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and he is thus subject to direct liability under 18 U.S.C. § 1595.

329.   Defendant Rashid's specific conduct that makes him liable as a perpetrator under 18 U.S.C. § 1591(a)(1) includes:

a. "harbor[ing]" plaintiff within the meaning of 18 U.S.C. § 1591(a)(1) by causing her to reside in apartments leased in his name during her trafficking;

b. "provid[ing]" plaintiff within the meaning of 18 U.S.C. § 1591(a)(1) by instructing plaintiff to engage in commercial sex with his customers; and

c. "advertis[ing]" plaintiff within the meaning of 18 U.S.C. § 1591(a)(1) by distributing information about his personal escort service—and about the women, including Plaintiff, who worked for that service—to potential customers orally, by telephone, through paid advertisements, and through social media.

330. Defendant Rashid's specific conduct that makes him liable as a perpetrator under 18 U.S.C. § 1591(a)(2) includes knowingly profiting from assisting in the operation of his escort service, which he knew was engaged in harboring, providing, and advertising trafficking victims within the meaning of 18 U.S.C. § 1591(a)(1).

331. Through their acts and omissions described above, the Casino Defendants and the Captive Business Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1), and they are thus subject to perpetrator liability under 18 U.S.C. § 1595.

332. The specific conduct of Defendants Wynn and MGM Grand that makes them liable as a perpetrator under 18 U.S.C. § 1591(a)(1) includes "harbor[ing]" Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1). Each knowingly harbored Plaintiff by providing shelter and refuge for her activities, which it certainly knew included illegal commercial sex, and which it knew or at least recklessly disregarded resulted from her being coerced by traffickers.

333. When Wynn or MGM Grand got a call from a known escort line asking it to confirm a guest's room or suite number, and Wynn or MGM Grand gave the requested confirmation, and Plaintiff then showed up on the property and went directly to that guest's room or suite, Wynn or MGM Grand knew that if it did not interfere, then it would be providing shelter and refuge for an illegal activity, yet neither ever interfered during any of the many times this pattern recurred.

334. The shelter and refuge was both literal—in the sense of a roof over her head—and metaphorical—in the sense of concealment from law enforcement detection. The concealment was accomplished both by the simple expedient of providing a private location where commercial sex could take place out of the public eye and by actively deterring law enforcement from investigating male guests and male guests' guestrooms as detailed more fully above.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

37

335.    The specific conduct of Defendant MGM Grand that makes it liable as a perpetrator under 18 U.S.C. § 1591(a)(1) also includes "transport[ing]" and "provid[ing]" Plaintiff because MGM Grand staff, including Mr. Clayton, knowingly walked Plaintiff from her car to the suites of guests who had just ordered commercial sex from an escort line, while knowing of or recklessly disregarding her coercion by her traffickers.

336.    Similarly, the specific conduct of Defendants Tao Group and STK that makes them liable as perpetrators under 18 U.S.C. § 1591(a)(1) includes "provid[ing]" Plaintiff because employees of Tao Group and STK knowingly connected Plaintiff with their own customers whom they knew or suspected were seeking to purchase commercial sex for purposes of enabling a commercial sex transaction, while knowing of or recklessly disregarding her coercion by her traffickers.

337.    The specific conduct of Defendant Tao Group that makes it liable as a perpetrator under 18 U.S.C. § 1591(a)(1) also includes "recruit[ing]" and "obtain[ing]" Plaintiff because employees of Tao Group knowingly contacted Plaintiff to convince her to come to Tao Group venues when they believed that they had customers present who were looking for commercial sex, while knowing of or recklessly disregarding her coercion by her traffickers.

338.    Even if the conduct of the Casino Defendants and the Captive Business Defendants detailed above does not constitute "harbor[ing]," "transport[ing]," or "provid[ing]," the same conduct makes them liable as perpetrators under 18 U.S.C. § 1591(a)(2) because it constituted knowingly "assisting, supporting, or facilitating" violations of 18 U.S.C. § 1591(a)(1), as those terms are used in 18 U.S.C. § 1591(e)(4).

339.    Through their acts and omissions described above, the Casino Defendants and the Captive Business Defendants knowingly benefitted from participating in ventures that engaged in acts in violation of § 1591(a), and they are thus subject to beneficiary liability under 18 U.S.C. § 1595.

340.    Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits and/or restitution;

c. Punitive damages, attorneys' fees, and expenses;

d. The costs of this action;

e. Pre- and post-judgment interest; and

f. Any other relief the Court or jury deems appropriate.

DATED this 17th day of July, 2025.

THE702FIRM
/S/ MICHAEL KANE

_____
MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada  89147

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
JONATHAN L. HILTON, ESQ.
Nevada Bar No. 16889
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Chloe C.*

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

39

## DEMAND FOR JURY TRIAL

Plaintiff Chloe C., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 17th day of July, 2025.

THE702FIRM
/S/ MICHAEL KANE

_____
MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada  89147

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
JONATHAN L. HILTON, ESQ.
Nevada Bar No. 16889
HILTON PARKER LLC
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Chloe C.*

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

40